IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ETERNIX, LTD.,

                           Plaintiff,

        v.                                              OPINION and ORDER

CIVILGEO, INC. and CHRIS MAEDER,                          23-cv-633-jdp

                           Defendants.

---

Plaintiff Eternix Ltd., a software company, alleges that defendants CivilGEO, Inc. and its founder, Chris Maeder, copied code from Eternix's software and incorporated it into CivilGEO's own software. Eternix brings claims for copyright infringement, misappropriation of trade secrets, breach of contract, and unjust enrichment.

Cross-motions for summary judgment are now before the court. Eternix moves for partial summary judgment on six issues. Specifically, Eternix moves on the issue of defendants' unauthorized copying and use of its software, which is a factual predicate for all of its claims. Eternix also moves on the other elements of liability for its copyright infringement claims and on the issue that its trade secrets are not generally known or readily ascertainable. Dkt. 100. Defendants move for summary judgment on all claims. Dkt. 95.

While the summary judgment motions were pending, defendant CivilGEO filed a suggestion of bankruptcy, so the case against CivilGEO is automatically stayed under 11 U.S.C. § 362(a). Dkt. 173. A bankruptcy stay prevents the court from issuing a ruling on any substantive issue. *Dean v. Trans World Airlines, Inc.*, 72 F.3d 754, 756 (9th Cir. 1995). So the court will rule on the summary judgment motions for defendant Maeder only.

The court concludes that Eternix is entitled to summary judgment on the unauthorized copying and on liability for its copyright infringement claim. Maeder's motion for summary judgment will be denied. The remaining issues will proceed to trial.

## UNDISPUTED FACTS

The court provides a brief overview of the facts below. Other facts, particularly those concerning the technical specifications of the parties' software, will be discussed as they become relevant to the analysis. The facts are undisputed except where noted.

Plaintiff Eternix Ltd. and defendant CivilGEO, Inc. are software companies. Defendant Chris Maeder is the sole owner of CivilGEO. Eternix and CivilGEO both produce mapping software. This case concerns Eternix's "Blaze Terra" software, which allows users to visualize Geographic Information System (GIS) data in three dimensions in real time.

### A. Maeder receives a trial version of Blaze Terra

In 2011, Maeder contacted Eternix to request a trial version of Blaze Terra for the purpose of evaluating the software and determining whether to purchase a license. At the time, Maeder was working for CM Water Group, a civil engineering software company he founded. Eternix's CEO, Raviv Brueller, agreed to provide Maeder with a trial version of Blaze Terra. Brueller wrote Maeder by email: "Since this is a limited-time license, currently we will not ask you to sign an End User License Agreement, but I do assume that you take upon yourself to use the license for the sake of evaluation purposes only, and that our products will not be used by or exposed to any person that is not part of your organization." Dkt. 102-25.

Eternix sent Maeder a trial version of Blaze Terra. In a follow-up email, Maeder thanked Eternix staff for "letting us try out Blaze Terra," telling them that it was an "amazing piece of

software." But Maeder and CM Water Group did not move forward with purchasing Blaze Terra at that time. Maeder told Eternix that he had "pushed on this side as much as I can at this time," but "with the global economic downturn, getting things approved are much slower and harder than ever before." Dkt. 102-27, at 3.

In 2013, Maeder contacted Brueller again, saying "[t]he economy here in the USA has started to pick up nicely and I feel that we can get your Blaze Terra software quickly approved for purchase this time." Dkt. 102-27, at 3. He requested another limited-time trial version of Blaze Terra so he could "demonstrate this software to the necessary people." *Id.* Eternix sent Maeder a USB device containing the software. Maeder again expressed how impressed he was with the product, saying that it was "exactly what we need." But in February 2014, Maeder told Eternix that he would not be purchasing the product, saying that "[u]nfortunately someone went around me and we ended up going with ESRI CityEngine." Dkt. 102-41, at 1. This was Maeder's last contact with Eternix before this lawsuit.

**B. Maeder forwards Blaze Terra and developers use it to make GeoHECRAS**

When Maeder first received a copy of Blaze Terra in 2011, he forwarded it to a company called Highlands Private Limited, which is located in India. Highlands provided software development services for CM Water Group. For the next several years, Highlands worked with Maeder to develop GeoHECRAS, the first product at issue in this case. GeoHECRAS is a mapping software used to model river water levels under different water resource management scenarios. Maeder provided the design specifications for GeoHECRAS and Highlands developed the software from those specifications. GeoHECRAS was launched in 2014.

Software developers working on GeoHECRAS left notes each time they saved their work. In 2013, more than 70 notes referred to "Blaze" or "Eternix." Several notes stated that

3

the developer updated or changed "Eternix" or "Eternix.Blaze" namespaces to "CivilGeo" or "CivilGeo.Infrastructure" namespaces. Others documented the incorporation of hundreds of Blaze Terra files into GeoHECRAS's code.

### C. Maeder forms CivilGEO and develops other products

Maeder formed CivilGEO in 2014 and, shortly after, he dissolved CM Water Group. CivilGEO entered into a contract with Highlands to develop two more products, GeoHECHMS and GeoSTORM. As with GeoHECRAS, Highlands developed the code for each of these products based on design specifications provided by Maeder. These products contain many of the same Blaze Terra files as GeoHECRAS. GeoHECHMS was launched in 2021 and GeoSTORM in 2024.

### D. Eternix learns about CivilGEO's use of its code

In March 2022, Eternix received an email from a former employee of CivilGEO, informing it that Chris Maeder had "bought your software," "cracked your source code and integrated it in his software GeoHECRAS," and "is earning millions of dollars by selling this software all over the world." Dkt. 102-42. Eternix asked Maeder to respond to the allegations and through counsel, he denied them. Eternix reviewed publicly available information about CivilGEO's products and concluded that CivilGEO had incorporated Blaze Terra's software into those products. Eternix then filed this lawsuit.

ANALYSIS

Eternix's claims fall into three categories: copyright infringement, misappropriation of trade secrets, and state common-law claims. Eternix moves for summary judgment on the issue

of defendants' unauthorized copying of its Blaze Terra code and on a few other elements of its copyright and trade secret claims. Maeder moves on all claims.

The court will briefly address an undisputed preliminary issue. Eternix moves on the issue whether Maeder is subject to liability under the Copyright Act, the Defend Trade Secrets Act, and the Wisconsin Uniform Trade Secrets Act. It is undisputed that Maeder is a Wisconsin citizen, that the relevant conduct occurred in Wisconsin, and thus that Wisconsin and federal law apply, so the court will grant Eternix's motion on this issue.

Summary judgment is appropriate only if there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment will be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

The court begins with Maeder's contention that Eternix's claims are barred by the applicable statutes of limitations.

## A. Statute of limitations

Maeder moves for summary judgment on the basis that Eternix's claims are barred by the statute of limitations. Summary judgment based on the statute of limitations is appropriate if the relevant statute of limitations has run and there are no genuine disputes as to when the claim accrued. *Jackson v. Rockford Hous. Auth.*, 213 F.3d 389, 394 (7th Cir. 2000).

1. **Copyright and trade secrets claims**

Claims for copyright infringement and misappropriation of trade secrets have a three-year statute of limitations. 17 U.S.C. § 507(b) (copyright); Wis. Stat. § 893.51(2) (trade secrets under state law); 18 U.S.C. § 1836(d) (trade secrets under federal law). The limitations period begins not when the violation occurred, but when it was discovered or reasonably should have been discovered. *See Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 479 (7th Cir. 2024) (discovery rule for copyright cases in the Seventh Circuit); Wis. Stat. § 893.51(2) (discovery rule for trade secrets misappropriation under state law); 18 U.S.C. § 1836(d) (same under federal law). Eternix contends that it discovered Maeder's misconduct in March 2022, when a former CivilGEO employee informed Eternix that CivilGEO had incorporated Blaze Terra's code into its own products. But Maeder contends that had Eternix exercised reasonable diligence, it would have discovered Maeder's misconduct much earlier.

The parties agree that Maeder's statute of limitations arguments do not apply to infringing conduct that happened within the three years before the lawsuit was filed. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014) (when defendant commits successive copyright violations, the statute of limitations runs separately from each violation). It is undisputed that some of the infringing conduct occurred less than three years before the lawsuit was filed, including all sales of the GeoHECHMS and GeoSTORM products, which were released in 2021 and 2024 respectively. Eternix's claims regarding this conduct are not time-barred.

As for the conduct that occurred more than three years before the lawsuit was filed, defendants contend that Eternix should have discovered that conduct through exercise of reasonable diligence. Whether a plaintiff exercised reasonable diligence in discovering

copyright or trademark violations is a question of fact, so on summary judgment, the question is whether there is admissible evidence that would allow a reasonable jury to find for Eternix. *See Gaiman v. McFarlane*, 360 F.3d 644, 657 (7th Cir. 2004).

### a. Motion to exclude opinions of defendant's market expert

There's a preliminary matter. Maeder relies on an expert, Daniel Ames, to support his contention that, had Eternix exercised reasonable diligence, it would have discovered the unauthorized copying before 2022. Dkt. 86 (Ames report). Maeder identified Ames as a rebuttal witness to Eternix's software development expert Yoav Zobel, who opined that Eternix had no reason to discover the unauthorized copying before 2022. Eternix moves to exclude Ames's opinions and testimony on this issue for two reasons: (1) because Ames's report was submitted untimely, and (2) because Ames's report is unreliable.[1]

As for timeliness, Eternix asserts that Ames's report goes beyond what is allowed in a rebuttal report, so Maeder should have provided his report by the deadline for initial expert disclosures, not rebuttal disclosures. The court will not exclude Ames's opinions on this basis. Under Federal Rule of Civil Procedure 26(a)(2)(D)(ii), rebuttal witnesses provide evidence "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Ames's evidence is intended to contradict the statement from Eternix's software development expert Yoav Zobel that "Eternix did not have any reason to know or suspect that Chris Maeder and CivilGEO were actually using its product." Dkt. 88, ¶ 49.

Eternix argues that Ames's opinion needed to be submitted by the deadline for initial expert disclosures because the parties agreed to disclose by that deadline all expert opinions

---

[1] Ames also provided opinions about whether Eternix and CivilGEO have overlapping user communities. Eternix does not move to exclude Ames's testimony about that issue.

relevant to issues on which that party bears the burden of proof. Dkt. 14, at 8. Eternix is correct that the statute of limitations is an affirmative defense for which Maeder bears the burden of proof. But when the statute of limitations has expired, the plaintiff bears the burden of showing that an applicable tolling doctrine applies, including the discovery rule. *Cathedral of Joy Baptist Church v. Vill. of Hazel Crest*, 22 F.3d 713, 717 (7th Cir. 1994); *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 314 F. Supp. 3d 931, 936 (N.D. Ill. 2018). Ames's opinion is a proper rebuttal opinion, introduced to rebut Zobel's evidence that Eternix would not have discovered defendants' conduct earlier through exercise of reasonable diligence.

That leaves the reliability of Ames's opinion. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993) and *Kumho Tire Company, Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999), the court must ensure that proffered expert testimony meets the requirements of Rule 702. For testimony to be admissible under Rule 702, the individual proffering the testimony must be qualified as an expert, the expert's opinions must be based on reliable methods, and those methods must be reliably applied to the facts of the case.

Ames's method involved reviewing archives of conferences, trade magazines, and other industry publications to "assess the potential of Eternix becoming aware of the CivilGEO Software before the present action." Dkt. 86, ¶¶ 24–29. From marketing materials and software documentation created by the companies, Ames determined that the main function of the Blaze Terra software was 3D geospatial visualization and the main function of CivilGEO's software products was hydrologic modeling. Ames found that conferences hosted by professional organizations like the American Geophysical Union and the International Society for Photogrammetry and Remote Sensing frequently included presentations on both 3D geospatial visualization and hydrologic modeling. Ames also found that multiple web-based

and print trade magazines reported on both Eternix's and CivilGEO's products. From these findings, Ames concluded that Eternix and CivilGEO have overlapping professional contacts and operate in the same general industries, and thus that Eternix should have been aware of CivilGEO before 2022. Ames also relied on his personal experience developing a similar software product to say that it is standard practice for software developers to maintain contact with users or potential users. He concluded from this that Eternix should have maintained contact with Maeder after sending him a trial version of the Blaze Terra software.

The "critical inquiry" for admissibility is whether an expert opinion is rationally connected to the underlying data or whether it is "connected to the existing data 'only by the *ipse dixit* of the expert.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017). Expert testimony that merely asserts a bottom-line conclusion or that is based on subjective belief or speculation is inadmissible. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010).

The court will not exclude Ames's testimony that Eternix and CivilGEO share professional contacts and market their products to the same broad professional community because Ames adequately explained how those conclusions are connected to his analysis of the software products' marketing materials and industry publications. But the court will exclude Ames's opinion that it is "highly likely" that Eternix would have become aware of CivilGEO's software "at least ten years ago, by about 2014." Dkt. 86, at 28. Ames does not explain how his analysis of Eternix and CivilGEO's overlapping professional contacts led him to conclude that the two companies would have known about each other by that year. Ames's conclusion is also inconsistent with the facts of this case. Maeder says that he formed CivilGEO in 2014, which makes it implausible that it is "highly likely" Eternix would have known about CivilGEO

9

by that year. Dkt. 123, ¶ 13. The court will also exclude any testimony based on Ames's personal experience developing a similar software product, including his testimony that it is standard practice for software developers to maintain contact with users. Ames's curriculum vitae shows that he has never worked in software development outside of academia, Dkt. 86-1, so his personal experience is unhelpful to explain the standard practices of software development companies like Eternix.

### b. Reasonable diligence

The court concludes that there are genuine disputes of material fact precluding summary judgment for Maeder on the reasonable diligence issue. Maeder essentially contends that Eternix should have monitored Maeder and CivilGEO to ensure that they did not misuse the Blaze Terra software. But a reasonable jury could find that monitoring was not necessary for Eternix to exercise reasonable diligence. Maeder represented to Eternix that he wanted copies of Blaze Terra for evaluation purposes only. And when Brueller sent Maeder an evaluation copy in 2011, Brueller told Maeder to use it only for evaluation purposes and not to share it with individuals outside his organization. A reasonable jury could infer that Eternix believed Maeder's representation about how he planned to use Blaze Terra and assumed that Maeder would comply with Brueller's instructions. If so, then a reasonable jury could find that Eternix had no reason to monitor Maeder and CivilGEO until Eternix received the email from CivilGEO's former employee in 2022.

Further, Eternix has adduced evidence from which a reasonable jury could find that Maeder actively concealed his use of Eternix's software. The statute of limitations is tolled when an infringer engages in "active misconduct" intended to "throw . . . [a copyright holder] off the scent." *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir. 1983). When Maeder decided

not to purchase Blaze Terra in 2014, he told Eternix that "someone went around me and we ended up going with ESRI CityEngine" instead. But Maeder has admitted that no one else was involved in the decision not to purchase Blaze Terra and that neither CM Water Group nor CivilGEO ever used ESRI CityEngine. Dkt. 125, ¶¶ 255–56. Maeder also dissolved CM Water Group and formed CivilGEO around the same time that GeoHECRAS was released. A reasonable jury could infer that Maeder lied about using ESRI CityEngine, and that he marketed GeoHECRAS under CivilGEO's name instead of CM Water Group's to prevent Eternix from discovering the product.

Maeder also contends that Eternix should have known about CivilGEO's products without active monitoring because both Eternix's and CivilGEO's products were widely marketed to the "earth science software community," so Eternix should have run across CivilGEO's products in the course of ordinary business. Maeder relies on the complaint, in which Eternix says that it was able to identify the unauthorized copying of the Blaze Terra code by reviewing publicly available information about CivilGEO's products on CivilGEO's website and social media channels. Dkt. 1, ¶ 40. Maeder says that in addition to its website and social media channels, CivilGEO published information about its products on a website called *GISUser* and a trade magazine called *Informed Infrastructure*, both of which also published information about Eternix's products. Maeder argues that Eternix should have found out about CivilGEO's products from these sources, which by Eternix's own admission would have been enough to make it aware of the unauthorized copying.

There are two problems with these arguments. First, a reasonable jury could disagree that Eternix should have visited CivilGEO's website or social media channels before 2022. All of Maeder's communications with Eternix were on behalf of CM Water Group, not CivilGEO,

so a reasonable jury could find that Eternix had no reason to know CivilGEO's name, much less to visit its website or social media. And second, it is genuinely disputed whether Eternix should have discovered CivilGEO's products through trade websites or magazines popular with members of the "earth science software community." Eternix leaders say that they are not familiar with the phrase "earth science software community," and they do not regularly review content on *GISUser* or in *Informed Infrastructure*.

Maeder relies on *Joyce v. Pepsico, Inc.*, 2012 WI App 52, 340 Wis. 2d 740, 813 N.W.2d 247, an unpublished decision in which the Wisconsin Court of Appeals dismissed a trade secrets claim for the plaintiffs' failure to exercise reasonable diligence in investigating possible misappropriation. *Id.* ¶¶ 20–21. A non-precedential decision of the Wisconsin court of appeals has no bearing on the standard for due diligence for federal copyright cases or for trade secret cases under federal law and is at most persuasive for trade secret cases under Wisconsin law. *See* Wis. Stat. § 809.23(3)(b). In any event, *Joyce* is distinguishable. *Joyce* involved a trade secrets claim about Aquafina water. But Aquafina is a readily available consumer product, which the plaintiff in that case would have encountered without having to constantly monitor potential competitors for trade secret violations. *See Id.* ¶ 20 (reasonable diligence does not require "superhuman effort" or "extraordinary steps"). CivilGEO's products, on the other hand, are not widely known outside the water resource management and earth science software industries. Maeder contends that Eternix should have encountered the product because it is also part of the earth science software industry, but a reasonable jury could find otherwise, particularly because Maeder admits that Eternix's products and CivilGEO's products "reside in completely different functional categories and have separate user communities." Dkt. 97, ¶ 39.

In sum, there are genuine disputes of fact on whether Eternix should have discovered the copyright and trade secret violations earlier through exercise of reasonable diligence. Maeder is not entitled to summary judgment based on the statute of limitations on the copyright and trade secret claims.

### 2. State-law claims

Eternix brings claims under Wisconsin law for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. Eternix's state-law claims are based on Maeder's alleged violation of the Blaze Terra license agreement, which prohibits Blaze Terra users from selling, redistributing, or otherwise using Blaze Terra in any manner inconsistent with the license agreement. The state-law claims are all based in contract, so they have a six-year statute of limitations. Wis. Stat. § 893.43(1); *Smith v. RecordQuest, LLC*, 989 F.3d 513, 522 (7th Cir. 2021) (unjust enrichment is a quasi-contract claim and has the same statute of limitations as contract claims). The limitations period begins when the underlying contract was breached, not when the breach was discovered. *CLL Assoc. Ltd. P'ship v. Arrowhead Pac. Corp*, 174 Wis. 2d 604, 607 (1993).

Eternix filed its complaint on September 14, 2023. Maeder's first alleged violation of the Blaze Terra licensing agreement was in 2011, when he sent Blaze Terra to his developers at Highlands Private Limited, which incorporated portions of it into GeoHECRAS. Eternix concedes that any claims based on that conduct, and any other conduct before September 14, 2017, is time-barred.

The parties' disagreement centers around the applicability of the continuing violation rule: when a contract imposes a continuing duty to perform, a new claim accrues for each separate breach. *Segall v. Hurwitz*, 114 Wis. 2d 471, 491 339 N.W.2d 333 (Ct. App. 1983).

Eternix contends that new claims accrued each time Maeder sold or distributed a product containing Blaze Terra's code, so claims based on sales or distributions after September 14, 2017, are timely.

Maeder contends that the continuing violation applies only to "separate and distinct occurrences that resulted in separate and distinct harms." Dkt. 122, at 35. In Maeder's view, sales or distribution of CivilGEO's software are not separate and distinct occurrences, but simply damages resulting from the single breach of the licensing agreement that occurred in 2011. But Maeder's view is inconsistent with the language of the licensing agreement. The agreement prohibits not only sharing the software with others and decompiling its source code, which is what Maeder did in 2011, but also selling or otherwise using Blaze Terra in any way not explicitly allowed by the agreement. Dkt. 102-26, at 3. Maeder violated the agreement not only in 2011 when he sent the Blaze Terra software to Highlands to be decompiled and incorporated into Blaze Terra, but also each time he sold or distributed products containing the Blaze Terra software. Eternix's claims based on sales or distribution of products after September 14, 2017, are not time-barred.

Maeder's contention is further undermined by *Noonan v. Northwestern Mutual Life Insurance Company.* 2004 WI App 154, 276 Wis. 2d 33, 687 N.W.2d 254. The plaintiffs in *Noonan* had an annuity contract that entitled them to annual dividend payments. In 1985, the company decided to change how it paid the dividends, resulting in underpayments that the Noonans did not discover until 2000. The company argued that the continuing violation rule did not apply because the underpayments were all consequences of the company's decision in 1985. *Id.* ¶ 31. But the court held that the contract imposed a continuing obligation to make accurate payments, so each underpayment was a separate breach. *Id.* ¶ 32. Similarly, the Blaze

14

Terra license agreement imposed a continuing obligation not to sell or distribute Blaze Terra's software. Viewing the facts in the light most favorable to Eternix, Maeder breached the license agreement each time he sold or distributed a product containing the software, so Eternix's state-law claims are not barred by the statute of limitations.[2] Maeder's motion for summary judgment based on the statute of limitations is denied.

## B. Copyright infringement

To establish a claim for copyright infringement, Eternix must show (1) ownership of a valid copyright, and (2) infringement, meaning copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Eternix asserts that it is moving for summary judgment on four "issues" related to its copyright claim, but these issues include all the elements necessary to establish liability for copyright infringement, so the court takes Eternix to be moving on liability for copyright infringement. Maeder moves for summary judgment on the whole claim.

### 1. Ownership and registration

Eternix moves for summary judgment on two issues that are not in dispute. First, Eternix moves on its ownership of the Blaze Terra code. Eternix has adduced evidence that the software developers who worked on Blaze Terra executed agreements stating that Eternix would

---

[2] Maeder relies on three out-of-state district court cases to support his view of the continuing violation rule. *KnowledgeAZ, Inc. v. Jim Walters Res., Inc.*, 617 F. Supp. 2d 774 (S.D. Ind. 2008); *Nuance Commc'ns, Inc. v. Int'l Bus. Machines Corp.*, 544 F. Supp. 3d 353 (S.D.N.Y. 2021); *Ruddy v. Equitable Life Assurance Soc'y of U.S.*, No. CIV. A. DKC 00-70, 2000 WL 964770 (D. Md. June 20, 2000). These are not persuasive in light of *Noonan*. And in any event, in each of these cases, the defendant entirely repudiated the contract, which isn't the case here. The license agreement imposed an ongoing obligation on Maeder not to sell or distribute the Blaze Terra software. Even if Maeder breached the license agreement's prohibition against sharing and decompiling the software in 2011, the requirements not to sell or distribute the software were still in effect.

own the code they created. Because the software developers created the code for Eternix, Eternix is the owner of any copyright. *See* 17 U.S.C § 201(a)–(b) (the owner of a copyright is the author or the employer or other person for whom the work was prepared). Second, Eternix moves on the inapplicability of the copyright registration requirement. Eternix is an Israeli company; thus, Blaze Terra is a foreign work and does not need to register its copyright before filing suit. *See* 17 U.S.C. § 411(a). The court will grant Eternix's motion on these two undisputed issues: Eternix is the owner of the copyright to Blaze Terra, and it may proceed in this suit notwithstanding the lack of copyright registration.

### 2. Unauthorized copying

Eternix also moves for summary judgment on the issue that Maeder, without authorization, "took, copied, and used Eternix's Blaze Terra software code in their products and made, sold, licensed, and distributed their products containing that code." Dkt. 110, at 9.

Eternix says that CivilGEO's products contain three types of code files from Blaze Terra: the "HLSL shader files," Dkt. 125, ¶¶ 141–61, the "EBHelper file," Dkt. 125, ¶¶ 162–85 and the "C# files," Dkt. 125, ¶¶ 186–99. The HLSL shader files are the primary driver behind the visualization component of Blaze Terra. The EBHelper file contributes to data processing functions. The C# files help Blaze Terra convert between numeric and visual data. Eternix's software expert Michael Mitzenmacher analyzed the CivilGEO software products and found evidence that all three categories of code had been copied. Dkt. 90. Mitzenmacher concluded that the HLSL shader files and the EBHelper file had been copied verbatim into CivilGEO's products in binary code form. As for the C# code, Mitzenmacher concluded that more than a hundred of those files had been decompiled into source code and then copied into CivilGEO's software. The C# files in CivilGEO's products were not identical to the files in Blaze Terra

because they had been decompiled into source code and then recompiled, but Mitzenmacher found numerous markers of copying, including identical or nearly identical file names, matching library architecture, matching programming constructs, and matching log messages, including in some instances identical typos within the messages. Dkt. 125, ¶¶ 324–42. In total, Mitzenmacher identified hundreds of files in CivilGEO's products that had been copied from Blaze Terra either verbatim or through decompilation.

Maeder purports to dispute almost all of Eternix's proposed findings of fact about copying, but his responses consist of legal arguments and unresponsive additional facts. Maeder does not identify contradictory evidence in the record, nor has he demonstrated that Eternix lacks admissible evidence to support its proposed facts. Maeder also does not substantively address the copying issue in his response brief to Eternix's motion for summary judgment. None of Eternix's proposed facts about copying are genuinely disputed, so the court deems it undisputed that Maeder copied without authorization all the files identified by Mitzenmacher.

### 3.  Originality of copied code

Both parties move for summary judgment on whether the code Maeder copied from Blaze Terra was original. To establish copyright infringement, a plaintiff must demonstrate that the defendant copied "constituent elements of the work that are original." *Feist*, 499 U.S. at 362. Originality means that the copied portions (1) were independently created by the author; and (2) possess some minimal degree of creativity. *Id.* at 345. Originality is a pure question of law. *Janky v. Lake Cnty. Convention And Visitors Bureau*, 576 F.3d 356 (7th Cir. 2009).

The minimal creativity element is undisputed and Eternix's software experts identified several creative design choices within the Blaze Terra code, including the variable names and

organization of the code, the programming languages used for different functions, and the messages and warnings that appeared to record the program's actions. The court agrees that Eternix has established that the Blaze Terra code possesses the minimal degree of creativity necessary for copyright protection.

The parties' disagreement concerns whether the copied portions of code were independently created by Eternix. Eternix's software development lead Yoav Zobel stated in his expert report that Blaze Terra was the product of thousands of hours of development work by multiple Eternix software developers. Dkt. 88, ¶¶ 42–45. Eternix's software expert Mitzenmacher also determined that the software was independently created by Eternix's engineers. Mitzenmacher reported that "[b]ased on the number of SVN usernames in the Blaze Terra SVN history, the Blaze Terra software was created by numerous Eternix software engineers who, between 2007 and 2013, made 6,265 individual commits or revisions—each representing a discrete moment in time when changes were made to the Blaze Terra codebase." Dkt. 90, ¶ 107. Zobel admitted that Blaze Terra contained some open-source and other third-party derived code, but he said that it was Eternix's practice to explicitly label such code as third-party within the software. Dkt. 117 (Zobel declaration), ¶ 12.

Maeder contends that Eternix has failed to show that the copied portions of code were independently created. Maeder's software expert, Nick Ferrara, identified several files within the Blaze Terra codebase that contained indicia of third-party authorship. Ferrara concluded that 92.3 percent of the EBHelper file was third-party derived. Dkt. 87, ¶ 180. He also concluded that six C# files pertaining to geodetic measurements had been derived from publicly available C# source code developed by programmer Mike Gavaghan. Dkt. 87, ¶ 177–78.

Ferrara's report does not raise a genuine dispute as to whether CivilGEO's products copied original authorship by Eternix; in fact, Ferrara's analysis supports that conclusion. As explained above, Mitzenmacher determined that hundreds of Blaze Terra files had been incorporated into CivilGEO's products, including the HLSL shader files, the EBHelper file, and the C# files. Ferrara did not identify any HLSL shader files that were third-party derived. Ferrara determined that 92.3 percent of the EBHelper file was third-party derived, but he also admitted that at least two functions within the EBHelper file had been written by Eternix. Dkt. 87, ¶ 152. As for the C# code, Ferrara concluded that only six of more than a hundred copied C# files were third-party derived. Even if a jury fully credited Ferrara's conclusions about which files are third-party derived, that still leaves more than a hundred files that were copied from Blaze Terra that were indisputably created by Eternix. The court concludes that it is undisputed that Maeder copied constituent elements of Blaze Terra that constituted original authorship by Eternix.

The parties dedicate significant portions of their briefs to whether Eternix can assert copyright protection over the portions of code that are third-party derived. Eternix contends that even this code is subject to copyright protection because Eternix's engineers "modified and optimized code that initially came from an open-source module," and because its engineers made expressive design choices in the selection and arrangement of code from open-source libraries. Dkt. 127, at 34. Maeder contends that Eternix hasn't sufficiently explained how it modified the open-source code or what choices were made to justify copyright protection. The court will leave this question for another day. The parties' dispute about how much original code was copied is a question of damages, not liability.

19

In sum, the court will grant Eternix's motion for summary judgment on the registration, ownership, copying, and originality issues, which is all Eternix needs to show to establish liability for copyright infringement. Maeder's motion for summary judgment will be denied. The copyright infringement claim will proceed to trial on Maeder's statute of limitations defense and on damages.

## C. Misappropriation of trade secrets

Eternix asserts claims for misappropriation of trade secrets under Wisconsin's Uniform Trade Secrets Act (UTSA), Wis. Stat. § 134.90, and the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836. The parties do not distinguish between state and federal law, and this court has recognized that the UTSA and DTSA are functionally equivalent. *See Fiskars Finland Oy Ab v. Woodland Tools Inc.*, No. 22-cv-540-jdp, 2024 WL 3936444, at *15 (W.D. Wis. Aug. 26, 2024). There are two basic elements of a claim: (1) the defendant acquired, used, or disclosed the information through improper means; and (2) the information at issue qualifies as a trade secret. 18 U.S.C. § 1639(5); Wis. Stat. § 134.90(2). The court has already concluded that Eternix is entitled to summary judgment on the improper acquisition and use of the Blaze Terra code. *See* Section B.2. So the only remaining question is whether the misappropriated information qualifies as a trade secret.

Eternix bears the burden of showing that the information misappropriated from its software meets the definition of a trade secret. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002). To be a trade secret, information must meet two statutory criteria: (1) it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) it is the subject of efforts to maintain its

secrecy that are reasonable under the circumstances. 18 U.S.C. § 1839(3); Wis. Stat.
§ 134.90(c).

Eternix contends that Maeder misappropriated 28 trade secrets in the Blaze Terra code.
*See* Dkt. 88, Exhibits 1–28. Maeder contends that Eternix's claims fail with regard to all 28
trade secrets for three reasons: (1) Eternix doesn't identify the trade secrets with sufficient
specificity; (2) the information within the trade secrets is generally known or readily
ascertainable; and (3) Eternix did not make reasonable efforts to maintain the secrecy of the
trade secrets. Eternix also moves for summary judgment on the issue whether its trade secrets
are not generally known or readily ascertainable. The court will address each issue in turn.

### 1. Identification of trade secrets

A plaintiff asserting a trade secrets claim must identify each asserted trade secret with
enough specificity to allow a reasonable jury to find that it meets each element of a trade secret.
*See, REXA, Inc. v. Chester*, 42 F.4th 652, 663 (7th Cir. 2022). In the software context, it's not
enough to say that a whole software package is a trade secret, nor is it enough to describe the
functions and features of the software as a whole. *IDX Sys. Corp.*, 285 F.3d at 583. Rather, the
plaintiff must describe the specific programs, methods, or processes over which it is asserting
trade secret protection, "separat[ing] the trade secrets from the other information that goes
into any software package." *Id.*

Eternix has identified 28 trade secrets within its Blaze Terra software. *See* Dkt. 88,
Exhibits 1–28. Unlike the plaintiff in *IDX Systems Corporation*, which described the functions
of its software generally without explaining which functions were attributable to the trade
secrets, Eternix has separately identified the relevant source and binary code for each of its
asserted trade secrets and explained how that code implements specific valuable functions

within Blaze Terra. *Id.*; *see also* Dkt. 88-4 (identifying the specific lines of code relevant to each trade secret). This is enough to sufficiently identify the 28 trade secrets.

Maeder contends that Eternix's identifications are insufficient because they focus on Blaze Terra's functionality without "identify[ing] the specific concepts, designs, methods, or processes" underlying that functionality. Dkt. 96, at 25. Maeder uses trade secrets 1, 3, 4, and 5 as examples of these deficiencies, so the court will do the same.

Trade secret 1 is Blaze Terra's "unique capacity to open all types of geospatial data sets in one scene." Dkt 88-1. Trade Secret 3 is Blaze Terra's "implementation of graph-based cache of compound coordinate-system transformations, allowing fast and accurate transformation of coordinates between multiple geographic projections, camera models and image registration models, supporting a large number of transformations and coordinate systems." Dkt. 88-3. Maeder says that these descriptions describe "what the alleged trade secrets do, not what they are." Dkt. 96, at 18 (citing *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, No. 1:17-CV-8829, 2020 WL 2836778 (N.D. Ill. May 31, 2020)). But Maeder's descriptions of these two trade secrets are misleading: he provides only the title of the trade secrets, even though Eternix provided much more than that in its explanations. *See* Dkt. 88-1 and Dkt. 88-3. For example, for trade secret 1, Eternix identified the key code file that allows Blaze Terra to open all types of geospatial data in one scene, as well as other relevant files. Eternix also explained how the code works to "paint" multiple types of geospatial data onto one visual scene. Eternix's explanation of its trade secrets is more than sufficient to explain what the alleged trade secrets are beyond their mere functionality.

Trade secret 4 is Blaze Terra's image enhancement technology and trade secret 5 is its proprietary image file format. Dkt. 88-4 and Dkt. 88-5. Maeder contends that Eternix simply

states that these trade secrets involve "Eternix-developed formulas" and "algorithms" without describing any specifics about those formulas or algorithms. Dkt. 96, at 26. But again, this is misleading. Eternix has identified the specific files of code that contain trade secrets 4 and 5, so it is plainly asserting that the formulas and algorithms are in those files. Dkt. 88-4 and Dkt. 88-5. If Maeder believed that the files of code Eternix identified don't contain proprietary formulas or algorithms, Maeder could have explained that in his brief. But he hasn't done so, so he has forfeited that argument.

Finally, Maeder challenges any assertion by Eternix that there are more than 28 trade secrets. Maeder appears to be relying on a statement from Zobel's report in which Zobel states that "[i]n addition to these trade secrets being valuable and not generally known or readily accessible as individual items, they also form a combination of elements that is valuable and not generally known or readily accessible." Dkt. 88, ¶ 27. Maeder argues that Eternix has failed to identify with specificity any "combination of elements" that would form a trade secret beyond the 28 already identified. But Eternix doesn't say in any of its briefs that there are more than 28 trade secrets, and the court doesn't take Zobel to be saying that in the section of his report cited by Maeder. Rather, Zobel's statement appears to be directed at the "generally known or readily ascertainable" element of a trade secret claim: he appears to be asserting that the way the trade secrets work together is one factor that make them secret. If Eternix is asserting that there are more than 28 trade secrets, the court concludes that it has forfeited the issue because it did not respond to Maeder's arguments. *See Nichols v. Mich. City Plant Planning Dep't.*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). The court will allow Eternix to proceed to trial on only the 28 identified trade secrets.

### 2. Generally known or readily ascertainable

Both parties move for summary judgment on the issue whether the 28 trade secrets are generally known or readily ascertainable.[3] To establish this element of its trade secrets claim, Eternix must show that its trade secrets are not generally known or easily duplicated by someone with skills and knowledge in Eternix's area of business; in other words, that the trade secrets are actually "secret." *Computer Care v. Serv. Sys. Enterprises, Inc.*, 982 F.2d 1063, 1075 (7th Cir. 1992). Eternix provides supporting evidence in Zobel's expert report. Zobel said that the Blaze Terra code was the product of years of effort by more than eleven software developers. He said that each of the trade secrets is valuable in itself because the underlying code is complicated and few software developers would be able to replicate it, and that the trade secrets are also valuable because they work together to produce a seamless geospatial data visualization engine. Dkt. 88, ¶¶ 29–34; 39; *see also* Dkt. 90, ¶¶ 112; 115; *3M v. Pribyl,* 259 F.3d 587, 595–96 (7th Cir. 2001) (trade secrets that may be generally known individually can still be secret based on how they work together).

Maeder contends that some of the trade secrets are generally known because they contain open-source code. But the fact that some of the trade secrets contain open-source code isn't enough to defeat Eternix's trade secret claims. Maeder's expert concedes that none of the trade secrets are *entirely* open source. *See* Dkt. 87, ¶ 152 (identifying two functions within the EBHelper file that were written by Eternix). Nor does the existence of some open-source

---

[3] Maeder did not argue that the asserted trade secrets were generally known or readily ascertainable until his reply brief, so he has arguably forfeited any contention that he is entitled to summary judgment on the issue. *See Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011). But he also made that argument in opposition to Eternix's motion and Eternix responded to it on reply, so the court will address the issue.

components mean that the software are not secret. Open source or other generally known components may still form a trade secret if they are combined in unique ways, akin to the ingredients in a proprietary recipe. *See Pribyl*, 259 F.3d at 595–96 (7th Cir. 2001). Here, a reasonable jury could find that although Eternix used open-source "ingredients" in its code, the way it combined those ingredients was sufficiently secret to be protectable. Maeder is not entitled to summary judgment on the basis that the asserted trade secrets are generally known or readily ascertainable.

But Eternix is also not entitled to summary judgment on this issue because many of the relevant facts about the complexity of Eternix's code are disputed. Maeder's software expert, Ferrara, concluded that Eternix used well-known coding methodologies to create the alleged trade secrets, ones familiar to most trained software developers. Ferrara opined that the code underlying the trade secrets, which Zobel described as complex, was actually relatively simple, to the point that similar techniques are taught in many non-graduate level courses in computer science. Dkt. 87, ¶ 47. And as for how the trade secrets work together, Ferrara disagreed with Zobel's opinion that Blaze Terra had unique data visualization capabilities. Ferrara determined that Blaze Terra's capabilities were similar to other tools that display GIS data, including the open-source tool QuantumGIS. Dkt. 87, ¶ 135. Eternix's experts disagree with Ferrara's conclusions, and the credibility of the parties' experts is a question to be resolved at trial.

### 3. Reasonable measures to maintain secrecy

Maeder contends that Eternix's trade secrets claims fail because Eternix did not take reasonable measures to protect its trade secrets. Dkt. 111, at 26–27. Whether a company acted reasonably to protect its trade secrets is a question of fact, so it can be resolved on summary judgment only if no reasonable jury could find the company's actions sufficient. *Rockwell*

*Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174 (7th Cir. 1991). That's not the case here. Eternix adduced evidence that all of its employees and contractors had to sign confidentiality agreements requiring them to protect the Blaze Terra source code, and that all customers and prospective customers had to accept the Blaze Terra licensing agreement before accessing the software. Dkt. 125, ¶¶ 25; 33–57; 49, 64–65; 207–210. The steps Eternix took to protect its code are much more substantial than in the cases cited by Maeder, in which the plaintiff companies had no confidentiality agreements or other measures in place to protect their asserted trade secrets from disclosure. *Fail-Safe, LLC v. A.O. Smith Corp.*, 674 F.3d 889, 893 (7th Cir. 2012); *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 898 (N.D. Ill. 2019).

Maeder points out that Eternix didn't fully comply with its confidentiality procedures, because it didn't enter into a confidentiality agreement with one subcontractor, Ben Fenster, who worked on its code. It's not clear from the parties' submissions whether this is true—the proposed findings of fact Maeder cites to support this proposition say that Fenster signed a subcontractor agreement, but don't say whether the agreement included a confidentiality provision.[4] Dkt. 125, ¶¶ 60–65. But even if Fenster hadn't signed a confidentiality agreement, that wouldn't change the court's analysis. A reasonable jury could find that Eternix acted reasonably to protect its trade secrets even if it failed to fully comply with its confidentiality procedures. *See Rockwell Graphic Sys., Inc.*, 925 F.2d at 177 (7th Cir. 1991) (jury question

---

[4] Eternix provided a copy of Fenster's subcontractor agreement, but it is written in Hebrew, so the court cannot determine from the document itself whether it contains a confidentiality provision. Dkt. 102-24.

whether company took reasonable measures, even though company admitted it regularly ignored its policy of asking vendors to return copies of its trade secrets).

### D. Contract claims

Eternix asserts claims for breach of contract and breach of the covenant of good faith and fair dealing based on Maeder's alleged violation of the Blaze Terra license agreement, which prohibits Blaze Terra users from selling, redistributing, or otherwise using Blaze Terra in any manner inconsistent with the license agreement. Breach of contract claims under Wisconsin law have three elements: (1) the existence of a valid contract; (2) breach of that contract; and (3) damages. *Pagoudis v. Keidl*, 2023 WI 27, ¶ 12, 406 Wis. 2d 542, 988 N.W.2d 606.

Eternix moves for summary judgment on the unauthorized copying of its software, contending that the undisputed facts establish that Maeder copied the Blaze Terra software, sold products containing its code, and otherwise used the software in violation of the license agreement. The court has already determined that Eternix is entitled to summary judgment on unauthorized copying. *See* Section B.2. The unauthorized copying is the factual predicate for the element of breach, but the court will not grant summary judgment to Eternix on the contract claims because, as explained below, there are disputes about the terms of Eternix's contract with Maeder.

Maeder contends that Eternix has failed to adduce evidence that there was a valid contract, for two reasons: (1) Eternix lacks evidence that Maeder accepted the Blaze Terra license agreement; and (2) any agreement Maeder made with Eternix was on behalf of CM Water Group, not Maeder individually.

Some clarification is needed first about the contract at issue. In support of his contention that he never signed the license agreement, Maeder points to a 2013 email in which

Raviv Brueller told Maeder that Eternix was "ready to waive, this time, the execution of the agreement sent to you." Dkt. 98-12, at 5. But its not clear why this is relevant, because Maeder admits that the "agreement" Eternix waived was not the Blaze Terra license agreement, but the Blaze Terra end-user agreement, a separate contract that Eternix's users sign when they agree to purchase the product. *Compare* Dkt. 102-26 (license agreement) *with* Dkt. 102-39 (end-user agreement). This is apparent when the relevant sentence of Brueller's email is quoted in full: "Nevertheless, as we understand from your message below that this causes difficulties, we are ready to waive, this time, the execution of the agreement sent to you and you'll rather confirm the acceptance of the license terms when installing the software (by check marking the appropriate acceptance statement)." Dkt. 98-12, at 5. Brueller's statement to Maeder about waiving the end-user agreement has no bearing on the question whether Maeder accepted the license agreement.

Maeder contends that he never accepted the license agreement. The license agreement is a "clickwrap" agreement, meaning that Maeder would have had to click "I agree" on the agreement in order to install Blaze Terra. Dkt. 125, ¶ 209. Maeder testified in his deposition that he never clicked "I agree" on the license agreement because he never installed Blaze Terra; instead, he testified that he gave the software to his software developers at Highlands Private Limited and the developers at Highlands installed it. Dkt. 85 (Maeder Dep. 46:24–47:8).

Maeder's testimony does not entitle him to summary judgment on the contract claims. A reasonable jury could disbelieve Maeder that he didn't install Blaze Terra. In a May 2011 email, Maeder told Eternix representatives: "Thank you for letting us try out Blaze Terra. It is an amazing piece of software." Dkt. 102-27, at 11. A reasonable jury could find that he did accept the license agreement and install the software in order to "try out" Blaze Terra.

And in any event, Maeder's argument that he never agreed to the license terms is a strawman. Eternix's contract claims are not dependent on whether Maeder clicked "I agree" on the software license agreement. A contract does not require a signature or even a written agreement; it requires only an offer, acceptance, and consideration resulting from a meeting of the minds as to the essential terms of the agreement. *Am. Nat. Prop. & Cas. Co. v. Nersesian*, 2004 WI App 215, ¶ 16, 277 Wis. 2d 430, 441, 689 N.W.2d 922, 927. Here, there is substantial evidence of an agreement between the parties that Maeder would use the Blaze Terra software only for evaluation purposes. When Brueller sent Maeder the software in 2011, Brueller wrote: "I do assume that you take upon yourself to use the license for the sake of evaluation purposes only, and that our products will not be used by or exposed to any person that is not part of your organization." Maeder did not object to these terms in his response; instead, he said: "Thank you prompt reply. . . Let me follow up with [Eternix employee] Yamit [Moskovich] once we are ready to install and evaluate the software." Dkt. 102-25, at 2–3. And two years later, when Maeder wanted a second copy of the software, he asked Eternix for a "'limited-time' (couple of days should be fine) trial version so I can demonstrate this software to the necessary people." Dkt. 102-27, at 3. Even if Maeder never formally accepted the license agreement, these conversations are more than sufficient to support an inference that Maeder agreed to use the software for evaluation purposes only and not to share it with others.

Maeder also contends that he is not individually liable for breach of contract because any contract was between Eternix and Maeder's company CM Water Group, not Maeder individually. "Where an agent merely contracts on behalf of a disclosed principal, the agent does not become personally liable to the other contracting party." *Benjamin Plumbing, Inc. v. Barnes*, 162 Wis. 2d 837, 848, 470 N.W.2d 888 (1991). But the key question is disclosure. An

agent is considered a party to a contract (and is thus personally liable for breach) if the agent discloses that he is acting for a business entity but doesn't disclose the corporate status of the business entity, so the other party doesn't know whether the business entity offers liability protection to its owners or shareholders. *Id.* at 848–49.

Maeder contends that he is not personally liable for any breach of contract because he disclosed to Eternix that he was acting on behalf of CM Water Group, a limited liability company. But Maeder didn't disclose that CM Water Group was a limited liability company until July 22, 2013, when he provided that information while giving Eternix an address to send a second evaluation copy of Blaze Terra. Dkt. 102-33, at 3. Before that, including during the entire course of his interactions with Eternix in 2011, Maeder never told Eternix that he was acting on behalf of a limited liability company. The only information Eternix would have known about CM Water Group before the July 2013 email would have been from Maeder's email signature, which named the company and described it as "Water Resource Consultants & Engineers." Disclosing a trade name alone is not sufficient disclosure because it doesn't reveal anything about the company's corporate status. *Benjamin Plumbing*, 162 Wis. 2d at 851. Maeder didn't disclose CM Water Group's corporate status until two years after he first received an evaluation copy of Blaze Terra, so he cannot escape individual liability for breach of contract.

In sum, Eternix is entitled to summary judgment on the unauthorized copying of the Blaze Terra code. Whether there was a valid contract, and the precise terms of the contract remain in dispute.

CONCLUSION

The court is granting summary judgment to Eternix on the following issues:

- Maeder is a Wisconsin resident and the relevant conduct occurred in Wisconsin, so the Copyright Act, the Defend Trade Secrets Act, and the Wisconsin Uniform Trade Secrets Act apply to this case;

- Eternix is the owner of the copyright to Blaze Terra;

- Eternix may proceed in this suit notwithstanding the lack of copyright registration;

- Maeder, without authorization, took, copied, and used Eternix's Blaze Terra software code in his products and made, sold, licensed, and distributed products containing that code; and

- Maeder copied constituent elements of Blaze Terra that constituted original authorship by Eternix;

Maeder's motion for summary judgment is denied. The case will proceed to trial on the following issues:

- Whether Eternix should have discovered Maeder's conduct before 2022 through exercise of reasonable diligence;

- whether Eternix's asserted trade secrets are generally known or readily ascertainable;

- whether Eternix took reasonable measures to protect the secrecy of its trade secrets;

- whether Maeder and Eternix had a valid contract and what the terms of the contract were; and

- damages for all claims.

The remaining question is whether this case should proceed to trial against Maeder, or whether the entire case should be stayed until defendant CivilGEO's bankruptcy stay lifts. In general, a bankruptcy stay does not automatically extend to non-bankrupt co-defendants. *See Pitts v. Unarco Indus., Inc.*, 698 F.2d 313, 314 (7th Cir. 1983). But almost all the legal and factual issues in this case are common to both defendants, so staying the case against Maeder

would prevent the court from holding two trials on essentially the same issues. The court will give Eternix and Maeder until May 7, 2025, to show cause whether this case should proceed to trial against Maeder, or whether it should be stayed in the interest of judicial economy. The deadline for motions in limine will be stayed until the court decides that issue.

ORDER

IT IS ORDERED that:

1. Plaintiff Eternix Ltd.'s motion for summary judgment, Dkt. 100, is GRANTED in part as described in this opinion. Plaintiff's motion for summary judgment is otherwise denied.

2. Defendant Chris Maeder's motion for summary judgment, Dkt. 95, is DENIED.

3. Plaintiff's motion to strike the expert report of Daniel Ames, Dkt. 121, is GRANTED in part and DENIED in part as described in this opinion.

4. Defendant CivilGEO has filed a suggestion of bankruptcy, Dkt. 173, so this case is automatically STAYED as to CivilGEO. Eternix and Maeder have until May 7, 2025, to show cause whether this case should proceed to trial against Maeder, or whether it should be stayed as to all defendants in the interest of judicial economy.

5. The deadline for motions in limine is STAYED until the court decides whether this case will proceed to trial against Maeder.

Entered April 23, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge